[No. D019329. Fourth Dist., Div. One. May 31, 1995.]

RONALD L. SAATHOFF, Plaintiff and Appellant, v.
CITY OF SAN DIEGO et al., Defendants and Respondents;
AMERICAN MEDICAL SERVICES, Real Party in Interest and
Respondent.

698

COUNSEL

Fogel, Feldman, Ostrov, Ringler & Klevens, Joel N. Klevens and Mia Darbonne Farber for Plaintiff and Appellant.

John W. Witt, City Attorney, and C. Alan Sumption, Chief Deputy City Attorney, for Defendants and Respondents.

Peterson & Price, Paul A. Peterson and Larry N. Murnane for Real Party in Interest and Respondent.

## OPINION

HUFFMAN, J.—Ronald L. Saathoff appeals from a judgment in favor of the City of San Diego et al., (hereafter the City or City Council) arising from the trial court's denial of his petition for writ of mandate. Saathoff asserted in his writ of mandate petition that the City Council's passage of a resolution based on a majority vote, awarding a paramedic system management contract to American Medical Services (hereafter American), constituted a franchise which required enactment of an ordinance based on a two-thirds vote. Given the relatively short-term four-year duration of the contract and the impermanent nature of the possessory use of public property, we hold the contract need not be deemed a franchise as a matter of law so as to invalidate the otherwise lawful exercise of governmental authority.

### FACTUAL AND PROCEDURAL BACKGROUND

In October 1992, the City Council approved the release of a "request for proposals" for paramedic system management. A notice of the procurement process was sent to 43 ambulance companies; in November 1992 the bidders made comments and asked questions at a bidders' conference; and bids were accepted until December 1992. The timely bidders included Hartson Medical Services, the San Diego Fire Department, and American. The bids were reviewed by a proposal evaluation committee, a board of fiscal advisers, and the city manager, and recommendations were made to the City Council. In February 1993, after public hearings regarding the proposals, the City Council adopted a resolution authorizing the award of the paramedic system management contract to American.

The agreement between the City and American runs for four years (July 1993-June 1997) and provides that American will respond to all requests for emergency medical services (for both basic life services and advanced life services)[1] received in the 911 medical dispatch center. Under the agreement, American uses the City's ambulances and support vehicles and certain other emergency equipment, houses paramedics at some fire stations, and operates the 911 communications center at the City's fire department, utilizing the

[1]See footnote 2, *post.*

City's major communications and computer equipment. The agreement is not assignable without written consent of the City (except for billing and collection and certain areas of equipment maintenance). Termination of the agreement could arise from a failure to comply with material provisions or the occurrence of certain events.

Prior paramedic system contracts to respond to 911 calls awarded by the city lasted for two-year or four-year periods.[2] These contracts, like the current American contract, were awarded by means of City Council resolutions.

The City Council's passage of the resolution awarding the paramedic contract to American was accomplished by a vote of five in favor and four opposed, which did not constitute the two-thirds vote required under the City's charter for the granting of a franchise. In his writ of mandate petition, Saathoff[3] alleged the contract constituted the award of a franchise which required an ordinance adopted by two-thirds of the City Council. Denying the writ, the trial court determined the contract was not a franchise.

ANALYSIS

The parties dispute whether the standard on appeal in this case should be our independent review of a question of law or the substantial evidence test involving deference to the trial court's judgment. ■ In reviewing the trial court's ruling on a writ of mandate (Code Civ. Proc., § 1085), the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial evidence. (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50].) However, the appellate court may make its own determination when the case involves resolution of questions of law where the facts are undisputed. (*Ibid.*)

Here, the pertinent facts are essentially undisputed. However, as we shall explain, the resolution of whether a franchise was created in this case

---

[2]That is, in prior years basic life support services (using emergency medical technicians instead of higher trained paramedics) were contracted out for two-year terms to several ambulance companies on a rotation basis, and advanced life support services (using paramedics) were contracted out to one company (Hartson Medical Services) for a four-year term with the possibility of two additional two-year extensions.

Although, under the current contract, American assumes responsibility for all 911 calls, including those requiring only basic life services, the City additionally indicated its intent to set up a referral system for basic life service ambulances from other companies to handle some ambulance requests. Some evidence was presented on the nature and extent of ambulance work available in the City apart from the 911 calls handled by American, but as will become apparent, this point is not pivotal to our analysis. (See fn. 13, *post.*)

[3]Saathoff, suing in his capacity as a taxpayer, is president of the San Diego City Fire Fighters local.

requires the drawing of inferences from the presented facts, i.e., to determine whether the paramedic agreement carries the indicia of a franchise to such an extent as to compel the city to create a franchise rather than a mere contract. Accordingly, since we are not presented purely with a question of law, we shall apply the substantial evidence test and give deference to the inferences in support of a finding that the agreement need not be deemed a franchise as a matter of law. (See *Atlantic Richfield Co.* v. *State of California* (1989) 214 Cal.App.3d 533, 538 [262 Cal.Rptr. 683].) We note, however, that even if we were exercising our independent judgment on the undisputed facts, we would reach the same conclusion as did the trial court.

The charter of the City, section 103, states: "FRANCHISES. [¶] The Council shall have power to grant to any person, firm or corporation, franchises, and all renewals, extensions and amendments thereof, for the use of any public property under the jurisdiction of the City. Such grants shall be made by ordinance adopted by vote of two-thirds (2/3) of the members of the Council and only after recommendations thereon have been made by the Manager and an opportunity for free and open competition and for public hearings have been given. No ordinance granting a franchise or a renewal, extension or amendment of an existing franchise shall be effective until thirty days after its passage, during which time it shall be subject to the referendum provisions of this Charter. No franchises shall be transferable except with the approval of the Council expressed by ordinance."

Section 103.1 of the charter similarly requires an ordinance for the establishment of works which supply public utilities or businesses which furnish services of a public utility nature.[4] Section 105 of the charter states that the City has plenary control "over all primary and secondary uses of its streets and other public places," the City may grant franchises, and the grantee of a franchise shall pay compensation to the City as consideration of the grant.[5]

---

[4]Section 103.1 states: "REGULATION OF PUBLIC UTILITIES. [¶] No person, firm or corporation shall establish and operate works for supplying the inhabitants of The City of San Diego with light, water, power, heat, transportation, telephone service, or other means of communication, or establish and carry on any business within said City which is designed to or does furnish services of a public utility nature to the inhabitants of said City, without the consent of said City manifested by ordinance of the Council. The Council shall have power to provide reasonable terms and conditions under which such businesses may be carried on and conducted within The City of San Diego."

[5]Section 105 states: "RIGHT OF REGULATION. [¶] Plenary control over all primary and secondary uses of its streets and other public places is vested in the City. Franchises may be granted upon such terms, conditions, restrictions or limitations as may be prescribed by ordinance. Every ordinance granting a franchise shall provide that the grantee therein named,

The charter does not specifically define what constitutes the granting of a franchise.[6] ■■■ The issue before us is whether the paramedic contract must be deemed a franchise as a matter of law, thereby invalidating the City's otherwise lawful exercise of its governmental authority through the passage of a resolution.

Mandamus is available to compel a governmental body to exercise its discretion under a proper interpretation of the applicable law. (*Common Cause* v. *Board of Supervisors* (1989) 49 Cal.3d 432, 442 [261 Cal.Rptr. 574, 777 P.2d 610].) However, mandamus is not available to compel a governmental body to exercise its discretion in a particular manner. (*Ibid.*) Thus, unless the instant agreement must be deemed a franchise as a matter of law, we cannot compel the City to so characterize it. Accordingly, we evaluate the degree to which this particular contract carries the indicia of a franchise. Since the evaluation involves a restraint on the government's choice of the manner in which it chooses to exercise its authority, the less the contract is imbued with the characteristics of a franchise, the more restrained the court should be in so restricting the otherwise lawful performance of governmental functions.

Although we are not faced with the issue as to whether the City *could* lawfully create a 911 ambulance service franchise if it chose to do so, we nevertheless make a threshold evaluation whether such a service might be the proper subject of a franchise.[7] Initially, we take a brief look at how some courts have evaluated a government's exercise of its police power to contract with a private party to provide public services.

In *Copt-Air* v. *City of San Diego* (1971) 15 Cal.App.3d 984, 988-989 [93 Cal.Rptr. 649], the court noted that a contract between a governmental body and a private party which creates a franchise "ordinarily refers to such services and functions as government itself is obligated to furnish to its citizens and usually concerns such matters of vital public interest as water, gas, electricity or telephone services, and the right to use the public streets and ways to bring them to the general public." Although franchises pertain to vital public services, when presented with an *attack* on a government contract delegating to a private party the performance of a vital public

as consideration for such grant, shall pay compensation to the City in an amount and in the mannner set forth in said ordinance."

[6]Section 106 of the charter does specify that permits for "minor or temporary utility purposes and privileges" which are revocable at the will of the City Council, are not franchises, but must be granted under the same ordinance procedures as for franchises.

[7]Although we are making this threshold evaluation, we express no opinion as to whether the City could, if it chose, deem a 911 ambulance service agreement a franchise for purposes of collecting franchise fees, and/or taxes, for the possessory use of public property.

service, such as garbage collection, the courts have not necessarily deemed the contract a franchise. For example, in *Ponti* v. *Burastero* (1952) 112 Cal.App.2d 846, 852 [247 P.2d 597], the court held that an exclusive 25-year contract to handle a city's garbage was merely the exercise of governmental police power, and was not a franchise subject to the charter provisions governing the method of awarding franchises.[8] In support of its holding, *Ponti* quotes several sources, which include statements that a city has the right under its police power to handle garbage itself, or to decide to have the service performed under a contract, and that franchise provisions are applicable only to specifically named public utilities, or utilities of a similar nature. (*Id.* at pp. 852-853.)

The same conclusion, pertaining to a contract for garbage collection, was reached in *Finney* v. *Estes* (1954) 130 Colo. 115 [273 P.2d 638, 640-641], where the court stated: "Common sense resolves a distinction between a contract for such [garbage collection] purposes and the term franchise, which ordinarily is accepted as being applicable to the well-known services which are deemed public utilities. To our knowledge, these utilities never have been considered in the same classification or category with the removal of garbage done under the responsiblity of a municipal corporation in performing an affirmative duty imposed thereon as a governmental function for the preservation of public health and safety. Having this imposed duty, a municipality can perform the function by its own employees or can farm the job out under contract; and in that connection, the choice of the City as to which method it will employ is beyond the control of the courts. [¶] . . . [¶] . . . [T]he trial court unmistakably sensed the distinction between a contract and a franchise and it would not sustain a complaint which sought to have the contract declared to be a franchise and unauthorized and in violation of the charter, . . ."[9]

As indicated in *Ponti* and *Finney*, franchises have been created when a governmental agency authorizes private companies to set up their infrastructures on public property in order to provide public utilities to the public; i.e.,

---

[8]The city in *Ponti* passed an ordinance authorizing the award of the contract. The ordinance was adopted after a publication period which was for a shorter time than that required under the franchise provisions, and the contract provided for lesser payments to the city than those required under the franchise provisions. (*Ponti* v. *Burastero, supra,* 112 Cal.App.2d at pp. 848, 850.)

[9]In *Finney,* the city had complied with an ordinance requiring that the garbage collection contract be awarded after competitive bidding, but did not comply with the charter provision requiring, inter alia, a vote of the electorate to grant a franchise. (*Finney* v. *Estes, supra,* 273 P.2d at pp. 639, 640.)

In addition to the fact that garbage collection was not a public utility, *Finney* points to the nonexclusive, revocable nature of the garbage collection agreement before it, which placed it more in the category of a revocable permit. (*Finney* v. *Estes, supra,* 273 P.2d at pp. 640-642.)

when railroad, gas, water, telephone, or electric companies set up tracks, pipes, poles, etc. across the streets and other public ways of a city. (See Pub. Util. Code, § 6001 et seq.; *Ray* v. *City of Owensboro* (Ky. 1967) 415 S.W.2d 77, 79.) However, the courts have also recognized that a city may set up franchises not only regarding the traditional utilities, but also pertaining to other services needed by the public, such as ambulance services, garbage collection, and television cable services. (*Ray* v. *City of Owensboro, supra,* 415 S.W.2d at pp. 79-80; *Community Tele-Communications* v. *Heather Corp.* (Colo. 1984) 677 P.2d 330, 338; see also *Santa Barbara County Taxpayer Assn.* v. *Board of Supervisors* (1989) 209 Cal.App.3d 940, 949 [257 Cal.Rptr. 615].) The court in *Ray, supra,* 415 S.W.2d at page 80, held that an ordinance awarding a 10-year right to an ambulance company to operate in the city was a lawful franchise, reasoning: ". . . a municipality under its police powers may provide for the health, safety and welfare of its inhabitants and . . . if the use of a franchise can be an effective instrument or tool in the providing of a more effective service, then certainly it is justified. By the use of a franchise the city can guarantee that the service will always be available; that it will be efficient and adequate; and that the operators will be qualified to act under emergency conditions."

*Ponti* v. *Burastero, supra,* 112 Cal.App.2d 846, which held that the garbage collection contract before it need not be deemed unlawful since it was not a franchise subject to franchise-award provisions, appears to rely on the fact that garbage collection was not a traditional or statutorily specified public utility.[10] However, as we have stated, when faced with the issue of whether a government *could* establish a certain type of franchise, the courts have defined franchises more broadly to include other public services which require the use of public streets and ways. This view is consistent with the City's charter provisions, sections 103 and 103.1, which separately address franchises and public utilities, and section 105 which refers to the granting of franchises in the context of the City's "[p]lenary control over all primary and secondary uses of its streets and other public places." (See 36 Am.Jur.2d (1968) Franchises, § 3, p. 725 [what is proper subject of franchise depends on extent to which public welfare is affected].)

---

[10]In its broad sense, a "public utility" is "a business or service which is engaged in regularly supplying the public with some commodity or service of public consequence, such as electricity, gas, water, transportation, telephone or telegraph service." (*Glenbrook Development Co.* v. *City of Brea* (1967) 253 Cal.App.2d 267, 272 [61 Cal.Rptr. 189]; 64 Am.Jur.2d (1972) Public Utilities, § 1, p. 549.) In California, public utilities under the jurisdiction of the Public Utilities Commission are specified by statute. (Pub. Util. Code, § 216, subd. (a); see 8 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 889, p. 434, § 895, pp. 442-443.) Public Utilities Code section 226, subdivision (d) excludes medical transportation vehicles from the service providers defined in the Public Utilities Code.

Accordingly, assuming arguendo that the City could properly grant a franchise for the provision of 911 ambulance services, we evaluate whether the agreement before us must be deemed a franchise as a matter of law.

■ The courts have delineated factors which are used to evaluate whether or not a government contract rises to the level of a franchise so as to trigger franchise laws. *Copt-Air* v. *City of San Diego, supra,* 15 Cal.App.3d at page 987 explains that the term franchise, as used in San Diego's charter, "refers generally to a special privilege conferred upon a corporation or individual by a government duly empowered to grant it. [Citation.] However, not every privilege conferred by government upon an individual or corporation achieves the dignity of a franchise. [Citations.]" *Copt-Air,* in addition to the criteria that the privilege involve a vital public service, states a franchise must pertain to a privilege that only the government can bestow and which is essential to the performance of the general function of the private party; and while the concept of a franchise does not require "continuance in perpetuity, . . . [it] involves some degree of permanence and stability."[11] (*Id.* at p. 989.)

Further elaboration on this concept of permanence associated with the creation of a franchise is contained in *Santa Barbara County Taxpayer Assn.* v. *Board of Supervisors, supra,* 209 Cal.App.3d at page 949, where the court explained, "A franchise agreement is granted by a governmental agency to enable an entity to provide vital public services with some degree of permanence and stability, as in the case of franchises for utilities. [Citation.] . . . [¶] A franchise is a grant of a possessory interest in public real property, similar to an easement. [Citations.] [¶] A franchise is a negotiated contract between a private enterprise and a governmental entity for the long-term possession of land. Franchise fees are paid as compensation for the grant of a right of way, not for a license or tax nor for a regulatory program of supervision or inspection. [Citations.] [¶] In sum, franchise fees are paid for the governmental grant of a relatively long possessory right to

---

[11]In *Copt-Air,* the court held the City's authorization to Sea World, Inc., to conduct a helicopter operation in Mission Bay Park did not constitute a franchise. The City had issued a permit without holding public hearings. (*Copt-Air* v. *City of San Diego, supra,* 15 Cal.App.3d at pp. 986, 988.) The court held the permit for a heliport on public land leased by Sea World was a license not a franchise, since the City granted a privilege a private land owner could equally grant; the helicopter sightseeing and taxi-flight rides were not essential to the general function of Sea World; the helicopter operation was not a vital public service; and the City's right to revoke upon 10 days' notice, without cause, did not create an agreement with a sufficient degree of permanence and stability. (*Id.* at pp. 988-989.)

use land, similar to an easement or a leasehold, to provide essential services to the general public. [Citations.]"[12]

 Here, there is no question the contracting out of emergency 911 ambulance services involves vital public services. However, the facts can support an inference that the contract with American does not create a relatively long possessory right to use public property, with the degree of permanence and stability which would require it be deemed a franchise as a matter of law. Four years need not be viewed as creating a long-term interest, and the use of the City's fire stations, communication center, and streets, does not involve a permanent intrusion into public property comparable to the installation of poles, wires, pipes, etc. utilized for the provision of other public services.

*Copt-Air* v. *City of San Diego, supra,* 15 Cal.App.3d at page 989 sheds some light on the reason charter provisions specifying the procedures necessary for the award of a franchise, have been enacted in the first place: "When the performance of such vital public services is to be delegated to private concerns by contract with the governmental body, it is essential that extraordinary precautions be taken to protect the public welfare. [Citation.] We think the very fact that section 103 of the charter not only requires public hearings, but subjects any franchise award to the referendum process, is indicative of an intent to confine the meaning of 'franchise' to contracts and agreements which are concerned with vital public services."

Similarly here, it makes sense that if the City enters into an agreement allowing long-term possession, of a permanent nature, of public property, it should be required to do so through the mechanisms of a franchise, with its guarantees, among other things, of a higher council vote, and of a fee as consideration to the City for the use of public property. (See, e.g., *Community Tele-Communications* v. *Heather Corp., supra,* 677 P.2d at p. 337 [10-year permit to lay cable and construct and operate cable television system deemed franchise; city acted unlawfully by not following franchise provisions].) In contrast, when the agreement frequently comes up for reconsideration by the government, and does not involve the creation of a substantial infrastructure on public property, the reasons for requiring establishment of a franchise become less compelling.[13]

Here, the City for many years has entered into agreements to provide 911 ambulance services, without ever treating the agreements as franchises. (See

---

[12]*Santa Barbara County Taxpayer Assn.* v. *Board of Supervisors, supra,* 209 Cal.App.3d at page 950 holds franchise fees were not " ' "proceeds of taxes" ' " for purposes of calculating the appropriations limit for taxes under the California Constitution.

[13]Given the facts in this case, which involve some use of real property, we need not evaluate the parties' dispute over whether the reference in charter section 103 to "franchises

*Ponti* v. *Burastero, supra,* 112 Cal.App.2d at p. 851 [contemporaneous and practical construction of a statute by those whose duty it is to carry it into effect, while not controlling, is always given great respect].) As we stated, given the relatively short and impermanent nature of the possessory interest created by the agreement before us, we hold it need not as a matter of law be deemed a franchise.

DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Hoffman, J.,* concurred.

---

. . . for the use of any public property" could encompass agreements involving only personal property.

Saathoff also points to the factor of exclusivity as an indicia of a franchise. We do not find the cases cited on this point particularly helpful in the case before us. A nonexclusive award of a right to multiple providers has been found to indicate the existence of a license rather than a franchise (*Subriar* v. *City of Bakersfield* (1976) 59 Cal.App.3d 175, 210-211 [130 Cal.Rptr. 853] [certificate of convenience and necessity required to operate ambulance company]), and a right-of-way available to multiple providers but not to the general public has been found to establish the exclusivity necessary for the taxation of a franchise (*County of Stanislaus* v. *Assessment Appeals Bd.* (1989) 213 Cal.App.3d 1445, 1451-1452 [262 Cal.Rptr. 439] [cable company could be taxed for use of streets to lay cables even though city grants more than one cable franchise]). Here, the issue we are faced with is whether a contract for the provision of a vital public service must be created as a franchise. The fact that the contract awards an exclusive right to one company to handle 911 calls, although perhaps suggesting the agreement is more than a mere license, does not otherwise appear to be of much import in the case before us.

*Judge of the San Diego Superior Court sitting under assignment by the Chairperson of the Judicial Council.